## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 31 2020, 12:29 pm

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Miriam Huck
Columbus, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of E.A. (Minor Child), Child in Need of Services, <br><br> M.A., (Mother), <br><br> *Appellant-Defendant,* <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Plaintiff.* | March 31, 2020 <br><br> Court of Appeals Case No. 19A-JC-2432 <br><br> Appeal from the Bartholomew Circuit Court <br><br> The Honorable Kelly Benjamin, Judge <br><br> The Honorable Heather Mollo, Magistrate <br><br> Trial Court Cause No. 03C01-1903-JC-1376 |

**Brown, Judge.**

[1] M.A. ("Mother") appeals the trial court's order adjudicating E.A. to be a child in need of services ("CHINS"). We affirm.

## Facts and Procedural History

[2] On March 6, 2019, E.A. was born. On March 11, 2019, the Indiana Department of Child Services ("DCS") filed a verified petition alleging E.A. to be a CHINS. The petition alleged DCS received a report on March 6th that E.A. was the victim of neglect and that Mother was the alleged perpetrator, was homeless and did not have adequate preparation for her newborn child, tested positive for methamphetamine in January 2019 while she was pregnant, and informed a family case manager that she had dropped charges against her fiancé who had been in jail for possession of methamphetamine, domestic battery, and bodily harm to a pregnant woman.

[3] On July 2, 2019, the court held a fact-finding hearing. Mother testified that she did not know the identity of E.A.'s father, she had three other children, the other children were removed by DCS in the past and were in the care of her family, two of the cases involving the other children related to her substance abuse, two of the other children had been adopted, and she had signed an adoption consent for the third child who still had an open CHINS case. She admitted she had a history of using methamphetamine and pled guilty to possession of a controlled substance and false informing in May 2019. She testified she did not test positive for methamphetamine during a pre-natal visit in January and had been providing screens to DCS which were negative. She admitted the last time she engaged in any substance abuse treatment was three

years ago when she graduated from the WRAP Program. She acknowledged she was arrested on April 22, 2019, for battery for slapping her boyfriend, and that she did not maintain stable housing during the case. She testified she had always wanted to participate in anger management and was aware DCS could provide that service. She indicated she was not employed and was working on it but did not have a car or a bicycle. When asked if her current residence would be a safe place for E.A., she answered: "Not right now." Transcript Volume II at 14.

[4] Jessica Hanner, a home-based family case worker, testified she began working with Mother in March 2019. She testified Mother attended one of three scheduled sessions in March and did not attend any visits in April. She testified she reached out to Mother weekly to offer her services, but Mother never responded. She learned in May that Mother was incarcerated. Mother attended three of four visits in June and canceled one due to a job interview. She testified that, during the last visit, Mother stated she did not have time to stay the full four hours and was "very negative about DCS," and she ended the visit due to Mother's failure to comply with visit rules. *Id.* at 19. On cross-examination, she testified Mother was appropriate with E.A. On redirect examination, she testified Mother had not shown an ability to provide supplies.

[5] Family Case Manager Supervisor Rachel Fry ("FCMS Fry") testified that E.A. "was going to need to stay in the hospital a little bit longer, due to what they thought was withdraws [sic] at that time" and Mother "was offered a chance to room in with the baby" but "declined that offer due to Mr. Hill not being

allowed to stay." *Id.* at 28. She testified she visited Mother in the hospital and informed her of DCS's concern regarding her possible substance abuse, her ability to provide for E.A.'s needs, and the history of domestic violence. She indicated Mother had been offered a place at Horizon House at that time but declined the position "due to her boyfriend who was released from jail not being able to go there, due to his criminal history." *Id.* at 25. She testified there was "a lack of follow through on [Mother's] part, and aggression." *Id.* at 27. She testified she was last informed Mother was staying in hotel rooms. On cross-examination, FCMS Fry indicated there was no evidence that Mother was under the influence at the hospital and she was not aware of any positive drug screens while Mother was at the hospital for labor and delivery.

[6] Family Case Manager Misty Taylor ("FCM Taylor") testified she went to the hospital and, upon asking similar questions of Mother, was "blatantly, quickly told it was none of [her] business, and to leave the room." *Id.* at 31. She testified she did not have an address where Mother was living and had not seen a home to which E.A. could return. She testified she felt Mother had a severe lack of understanding that "it takes a home, it takes stability, to be able to provide for her child as well, it takes consistency." *Id.* at 33. She testified she had a concern about Mother's past substance use but acknowledged Mother had been testing clean. When asked why would it not be safe to return E.A. to Mother's care, she answered: "Based on history, it is a concern with her inconsistency, currently her [i]nconsistency, the fact of the matter that she is not always extremely compliant, she is extremely aggressive, her previous

[domestic violence]." *Id.* at 36-37.  She also mentioned Mother's lack of housing, transportation, and parenting skills.  When asked to elaborate on her concerns specific to Mother's parenting, she answered: "Understanding that she needs to be willing and able to provide necessary items for the child.  And actually providing those items." *Id.* at 37.  She testified Mother's long history of substance abuse concerned her and DCS would like to see Mother have some services to help maintain her sobriety.

[7]     After DCS rested, Mother's counsel moved to dismiss the case, which the court denied.  Mother testified she had diapers, wipes, clothes, and a car seat at the hospital and that her mother "had to buy the car seat" because she "kept trying to call the number that they provided" her, and she "couldn't ever reach nobody." *Id.* at 42.  She testified she planned to breastfeed E.A.  When asked if it was true she did not have any place to go after the hospital with E.A., she answered in the negative.  When asked to explain what her plans were, she answered:

> My plan originally was maybe adoption, but the person that was gonna adopt her maybe, was offering me, saying if you can't do it when you have her, I understand.  So we had an agreement, everything was fine.  But when I had her, I couldn't do it.  So I got on the phone, I got on the internet, and I was looking for somewhere to go.  And I finally found Horizon House, they wouldn't allow Craig Hill, at the time to come there.  So I was like we should stick together as a family, let's look for somewhere else right now.  So I, I turned that down, at that moment.  Okay, well about a half hour later, Craig is like you know what, go.  And I'm like yeah, you're right, I need to go.  So I called them back.  I said, just, I want the room.  Me and [E.A.] are coming

there. So it was set up. And then I was supposed to go down there and show them my ID and do all that stuff, talk to them. But also I wanted to find something better, to get out of this town, so I called a place called New Hope in Bloomington. And had a place set up there too. Which I was never asked about or anything. So yeah, I was all excited, I had somewhere to go. I even called today to try and get documentation, and she was supposed to call me back.

*Id.* at 43-44.

[8]     She indicated she and Craig Hill were no longer a couple. When asked if she had any contact with him in the last month, she answered: "Hit and miss, but it's been, and I tell him to get away from me, leave me alone." *Id.* at 45. She indicated the battery to which she pled guilty did not occur in front of any children. She testified she did not bring supplies to care for E.A. at first, she asked Jessica about bringing supplies, and that Jessica indicated she would let her know when she needed to start bringing her own supplies. She indicated her plan for E.A. was for her "to be returned to my Mother." *Id.* at 47. She testified she was staying in a hotel and her grandmother and father had been helping her, and that she was not using any illegal substances currently or at the time of E.A.'s birth. On cross-examination, she stated that her father and grandmother would be purchasing items for visits and she would be unable to provide those items on her own until she obtained employment.

[9]     The court entered an order finding E.A. to be a CHINS and providing in part:

> The Court now adjudicates the child, [E.A.], a [CHINS] as
> defined by 31-34-1-1.

In support for this conclusion of law, the following findings of fact are found:

* * * * *

4. On March 6, 2019, DCS received a report alleging the Child to be a victim of neglect due to mother testing positive for methamphetamine during a pre-natal visit, the lack of stable housing, the lack of necessary supplies to care for an infant, and concerns that mother's current boyfriend had a history of domestic violence.

5. The Child was recommended to stay at the hospital due to going through withdrawals. Mother was invited to stay to help care for the Child. Mother was unwilling to do so without her boyfriend staying as well.

6. On March 7, 2019, FCM Misty Taylor met with Mother at the hospital in an attempt to safety plan with Mother regarding her plans for care of the child and living arrangements. Mother informed FCM Taylor that she did not need DCS assistance and asked FCM Taylor to leave. Mother was dismissive and verbally aggressive. FCM Taylor was provided no information on where Mother intended to take the child upon discharge.

7. On March 8, 2019, FCM Supervisor Rachel Fry met with Mother at the hospital. Mother had not obtained the necessary items for the Child, including a car seat, despite being given the information by the hospital social worker.

8. FCMS Fry also wanted to discuss with Mother her substance abuse history, which DCS had knowledge of due to prior involvement with three prior born children. The prior born children's cases also involved concerns with substance abuse by Mother. With the past DCS cases, Mother was non-compliant with case plans and services. The prior born children did not return to Mother's ca[r]e and permanency was achieved with adoption for two of the children; Mother signed adoption consents for these two children.

9. Mother has plead guilty to Possession of a Controlled Substance and False Informing in May 2019.

10. Mother reports a substance abuse history that dates back approximately ten years.

11. DCS was unable to ensure the safety of the Child in Mother's care and a decision to detain was made on March 9, 2019.

12. A Verified Petition Alleging [E.A.] to be [a CHINS] was filed by [DCS] on March 11, 2019.

13. DCS has concerns that Mother has anger issues that could affect the safety of an infant. FCM Taylor and FCMS Fry observed Mother swing from being verbally aggressive to having a conversational tone. Along with the verbal aggression, DCS has found Mother to have a short temper, to be dismissive, and to be unwilling to discuss how to alleviate concerns. Mother admitted that she was arrested for domestic battery on April 22, 2019 for slapping her boyfriend. However, at trial Mother maintained that it was no longer difficult for her to control her temper.

14. Mother has not had stable housing since the Child's birth. Mother does not have a stable address. She is living with a friend and requests to receive mail at her grandmother's home. Mother agrees that the house where she is currently staying is not a safe place for the Child. Since the Child's birth, DCS has also had information that Mother was living at a motel. Service providers have also provided transportation for Mother, picking her up at the Econolodge.

15. Mother is not currently employed and she lacks transportation.

16. While this case has been pending, Mother has tested negative on drug screens.

17. Mother graduated the WRAP program (Women Recovering With a Purpose), a yearlong substance treatment program. Mother graduated from this program two to three years ago.

18. DCS testified that Mother has been offered services to remedy the concerns that brought this case including home based case management, supervised visits, and individual therapy to address anger management. Mother attended one home based case management appointment where initial paperwork was completed. Two other sessions were scheduled. Mother failed to attend either and indicated that she did not need the services.

19. Mother has been sporadic in visiting with the Child, although visits were most consistent in June 2019. She attended two out of four visits in March. She had no visits in April or May due to incarceration. In the month of June, Mother attended three out of four visits.

20. Mother does provide appropriate care for the Child when visits do occur.

21. Mother has been difficult to communicate with in that she does not have a consistent phone number, has been incarcerated, and does not respond to FCM when she reaches out on numbers provided.

22. The Court finds that it is a combination of issues that support a finding of CHINS today in that Mother lacks sufficient stability, being without housing, employment or transportation; admits it is unsafe for the Child to return to her home today; evidence that substance use is a present concern; the unwillingness to plan for the safety of her Child; the tender age of the Child; and that Mother has not taken advantage of the services available to her to remedy the concerns.

Appellant's Appendix Volume II at 11-13.

[10]     On August 5, 2019, the court held a dispositional hearing.  The court inquired into Mother's absence, and Mother's counsel indicated she did not know Mother's whereabouts and stated:

> This was . . . set last, week I believe, she was unable, she got in contact and said she was unable to come, I was not given a reason.  And I did text her, at the number she was texting me from, the new Court date and time, but I have not heard back from her.

Transcript Volume II at 66.  FCMS Fry testified she did not have knowledge as to whether Mother was employed.

[11]     On September 17, 2019, the court entered a dispositional order finding that Mother failed to appear for the dispositional hearing and ordering Mother to complete a substance abuse evaluation and successfully complete any recommended treatment, participate in individual therapy with treatment goals to include anger management and domestic violence, participate in home-based case management services to assist with housing, employment, budgeting, and coping skills, contact the family case manager every week, and maintain suitable and safe housing and a legal and stable source of income.

## *Discussion*

[12]     Mother claims DCS's concerns that led to the removal of E.A. were tenuous and provided an insufficient basis for the trial court's conclusion that E.A. was a CHINS.  She asserts all drug screens submitted to DCS were negative and no evidence was presented that substance abuse was a current problem for her or

that E.A. tested positive for any substances. She asserts that her family could provide any necessary supplies for E.A. and that, although she did not have stable housing, she was ready to take E.A. with her to Horizon House or New Hope. She also argues DCS offered no evidence that her current plan for E.A. to live with her maternal grandparents would not be safe for E.A.

[13] In reviewing a trial court's determination that a child is in need of services, we do not reweigh the evidence or judge the credibility of witnesses and consider only the evidence which supports the trial court's decision and reasonable inferences drawn therefrom. *In re S.D.*, 2 N.E.3d 1283, 1286-1287 (Ind. 2014), *reh'g denied.* We apply the two-tiered standard of whether the evidence supports the findings and whether the findings support the judgment. *Id.* "We will reverse a CHINS determination only if it was clearly erroneous." *In re D.J.*, 68 N.E.3d 574, 578 (Ind. 2017). A decision is clearly erroneous if the record facts do not support the findings or if it applies the wrong legal standard to properly found facts. *Id.*

[14] Ind. Code § 31-34-1-1 provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
>> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>>
>>> (A) when the parent, guardian, or custodian is financially able to do so; or

> (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and [1]
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

The CHINS statute does not require a court to wait until a tragedy occurs to intervene. *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009). Rather, a child is a CHINS when he or she is endangered by parental action or inaction. *Id.* The purpose of a CHINS adjudication is not to punish the parents, but to protect the child. *Id.*

To the extent Mother does not challenge the trial court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

---

[1] Prior to July 1, 2019, Ind. Code § 31-34-1-1(1) provided:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> > (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and (2) . . . .

*See* Pub. L. No. 198-2019, § 8 (eff. Jul. 1, 2019).

After E.A.'s birth on March 6, 2019, Mother was arrested for battery in April 2019 and pled guilty to possession of a controlled substance and false informing in May 2019. At the July 2019 hearing, Mother acknowledged the removal of her other children by DCS and that two of the removals were related to her substance abuse. She admitted she had a history of using methamphetamine and acknowledged she did not maintain stable housing during the case and was unemployed. She also indicated her residence would not be a safe place for E.A.

As noted, the CHINS statute does not require that a court wait until a tragedy occurs to intervene. *See In re A.H.*, 913 N.E.2d at 306. Based upon the record, we conclude that the judgment reached by the trial court is not clearly erroneous.

For the foregoing reasons, we affirm the trial court's determination that E.A. is a CHINS.

Affirmed.

Najam, J., and Kirsch, J., concur.